**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| SHAWNEE MISSION MEDICAL CENTER, INC. (d/b/a ADVENTHEALTH SHAWNEE MISSION | ) ) ) | |
| Plaintiff, | ) ) | Cause No. 4:25-CV-513 |
| v. | ) ) | |
| BLUE CROSS AND BLUE SHIELD OF KANSAS CITY, | ) ) ) | |
| Defendant. | ) ) | |

## NOTICE OF REMOVAL

Blue Cross and Blue Shield of Kansas City ("Defendant" or "Blue KC") hereby removes Case No. 2516-CV20838, *Shawnee Mission Medical Center, Inc. (d/b/a AdventHealth Shawnee Mission) v. Blue Cross and Blue Shield of Kansas City*, from the Circuit Court of the County of Jackson, State of Missouri ("State Court Action"), to the United States District Court for the Western District of Missouri. Blue KC removes the action pursuant to 28 U.S.C. §§ 1331, 1332, 1441(a), 1442, 1446, and 1367. In support of its removal, Blue KC further states:

1. Blue KC is a Missouri nonprofit corporation with its principal place of business in Jackson County, Missouri. Petition ¶ 2.

2. It provides comprehensive health care coverage to approximately one million members in the greater Kansas City region.

3. Blue KC's mission is to provide affordable access to healthcare and to improve the health of its members.

4. Blue KC is an independent licensee of the Blue Cross Blue Shield Association ("BCBSA").

1

5. On July 1, 2025, Plaintiff filed a Petition in Jackson County, Missouri Case. No. 2516-CV20838 against Blue KC. ("Petition").

6. In its Petition, Plaintiff asserts claims for breach of contract, bad faith, quasi-contract, and injunctive relief arising from Blue KC's insistence on validating claims for payment, refusal to pay certain claims, and/or paying certain claims at rates Plaintiff finds to be insufficient.

## BACKGROUND

7. Blue KC's role with respect to any given claim varies depending on the type of plan, program, or policy at issue. Blue KC's roles may involve underwriting, administration, and/or processing claims for different types of healthcare benefits including, but not limited to:

      a.) Plans insured under employer-sponsored group insurance policies issued by Blue KC (fully insured group plans);

      b.) Self-insured plans, where Blue KC provides administrative services but the group plan or sponsor pays benefits due (administrative services only plans);

      c.) Programs covering federal employees and their dependents;

      d.) the Medicare Advantage Program (Medicare Part

8. Upon information and belief, each type of plan or program described in the preceding paragraph is implicated by Plaintiff's claims for reimbursement described in in its Petition. Several of those Plans and Programs are described in greater detail below.

### i. ERISA Plans

9. With certain limited exceptions, ERISA governs any "employee benefit plan" if the plan is established or maintained by an employer or employee organization engaged in commerce or in any industry or activity affecting commerce. 29 U.S.C. § 1003.

2

10. An "employee benefit plan" is defined as a "welfare benefit plan" or a "pension benefit plan." 29 U.S.C. §1002(3). A plan is a welfare benefit plan if it "was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise…benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1) (references to other types of employer-provided benefits qualifying as ERISA plans omitted).

11. ERISA expressly provides that it will apply to all employee welfare benefit plans with certain limited exceptions

12. Many, but not all, of the plans administered by Blue KC are sponsored by private employers and employee organizations (such as unions) and are governed by ERISA.

13. Upon information and belief, Blue KC is the claims fiduciary for many of the ERISA-governed plans at issue in this litigation and has acted in that capacity with respect to some of the claims at issue in this litigation.

### ii.     The Federal Employees' Health Benefits Program

14.  The Federal Employees' Health Benefits Program ("FEHBP") is a health benefits plan for federal employees, retirees, and their dependents created by the Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. §§ 8901-8914.

15.  Under FEHBA, the United States, through the Office of Personnel Management ("OPM"), contracts with various private carriers to offer health benefit plans to its employees, with a variety of benefits, coverages and costs.

16. OPM is charged with managing FEHBP "in the interest of both the employees and the Government," *id.*, and is specifically authorized by Congress to promulgate FEHBA regulations.  5 U.S.C. § 8913.

17. The importance to the federal government of cost controls in the FEHBP is illustrated by the fact that one of the first principles enunciated by Congress in enacting FEHBA was the need to "discourage unnecessary use of expensive facilities and services." S. Rep. No. 86-468, at 4 (1959).

18. The Blue Cross and Blue Shield Service Benefit Plan, also known as the Federal Employee Program or FEP, has been part of the FEHBP since its inception in 1960.

19. OPM contracts with the BCBSA, which sponsors the plan on behalf of various BCBS licensees across the country, which then underwrite the plan for members living or receiving services in the areas where they operate.

20. Nationwide, the FEP covers roughly 5.5 million Federal employees, retirees and their families out of the nearly 8.3 million people who receive their benefits through the FEHBP.

21. Although Blue KC administers the FEP in the greater Kansas City region, federal employees do not contract for health benefits with Blue KC or BCBSA. Instead, they "enroll" in the FEP pursuant to OPM's regulations. 5 C.F.R. §§ 890.101(a), .102-.104, and subparts C, D, and K. A statement of Benefits is issued annually in accordance with 5 U.S.C. § 8907 governs the benefits provided by FEP.

22. Blue KC administers claims relating to enrollees of FEP who receive covered services in the Kansas City area and, through that program, makes reimbursement payments from Blue KC's own accounts (and is, in turn, reimbursed pursuant to a letter of credit account for the FEP via a specially-created fund in the U.S. Treasury called the Employees Health Benefits Fund).

### iii. The Medicare Advantage Program

23. The Centers for Medicare and Medicaid Services ("CMS") is a branch of the Department of Health and Human Services responsible for administering Medicare benefits.

4

24. Under Medicare Part C, CMS may delegate its statutory obligation to provide Medicare benefits to private sector insurers, called Medicare Advantage Organizations.

25. Part C of the Medicare Act—authorizing CMS to contract out its duties—subjects Medicare Advantage Organizations to extensive federal statutes and regulations.

26. Those provisions also specifically contemplate the use of subcontractors under certain circumstances. *See* 42 C.F.R. § 422.504

27. Blue KC is a Medicare Advantage Organization and has been sued for its alleged actions or omissions as a Medicare Advantage Organization. Petition, ¶¶ 39-51.


**DIVERSITY JURISDICTION**

28. The Court may exercise diversity jurisdiction over this action.

29. Pursuant to 28 U.S.C. § 1332, this Court "shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – (2) "citizens of a State and citizens or subjects of a foreign state."

30. Plaintiff seeks damages in excess of $75,000. Petition, ¶ 96 ( stating, "Advent to date has suffered damages in excess of $2 million exclusive of prejudgment interest").

31. Plaintiff is a Kansas not-for-profit corporation, with its principal place of business in Shawnee Mission, Johnson County, Kansas. Petition, ¶ 1. It is a citizen of Kansas.

32. Blue KC has its principal place of business in Missouri and is incorporated in that state as well. It is a citizen Missouri.

33. There is complete diversity between the parties.

34. "[M]any courts have held that the forum-defendant rule does not apply … if the action is removed before the plaintiff 'properly join[s] and serve[s]' the forum-state defendant." *Cagle v. NHC Healthcare-Maryland Heights, LLC*, 78 F.4th 1061, 1066 (8th Cir. 2023)

35. At the time of this removal Blue KC has not been served with the Petition.

36. The State Court Action is removable because this Court has original jurisdiction based on the complete diversity of the parties and the amount in controversy exceeds $75,000. *See* Petition, ¶ 96.

## FEDERAL OFFICER JURISDICTION

37. Alternatively, the Court may exercise federal officer jurisdiction over this action.

38. Removal pursuant to 28 U.S.C. §1442(a)(1) ("Federal Officer jurisdiction") is appropriate where the removing party demonstrates that (1) it is a "person" under the statute, (2) it "acted under the direction of a federal officer," (3) a "causal connection" exists between its complained-of conduct and official federal authority, and (4) it has a "colorable federal defense" to the claim or claims against it.

39. Blue KC is a person as that term is used by 28 U.S.C. § 1442(a)(1).

40. When a health insurer participates in the Medicare Advantage program or FEHBP, as Blue KC has done, it is assisting the federal government with the basic governmental task of providing health benefits.

41. In this capacity, Blue KC delivers federal benefits to federal beneficiaries.

42. In this capacity, Blue KC does the business of the federal government and not merely its own business. *See Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, No. 22-10414, 2023 WL 2573914, at *3-4 (5th Cir. Mar. 20, 2023) (unpublished per curiam) (affirming denial of motion to remand where Medicare Advantage Organization removed litigation from state court to federal court).

43. In serving as a Medicare Advantage Organization, Blue KC performed a job that the federal government would otherwise have to perform.

6

44. Plaintiff asserts in this action, among other claims, claims for damages involving various federal laws and regulations governing Medicare Advantage Organizations. *See* Petition, ¶¶ 39-51, 78.

45. A person acts under the direction of a federal officer pursuant to 28 U.S.C. § 1442(a)(2) where its actions "involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007).

46. In serving as a Medicare Advantage Organization, Blue KC acted under the direction of a federal officer.

47. Blue KC acts under the direction of a federal officer because a Medicare Advantage Organization is "subject to extensive 'detailed regulation, monitoring, and supervision by the federal government while … assisting the government in carrying out its delegated duties." *See Trinity Home,* 2023 WL 2573914, at *3 (citing *Watson,* 551 U.S. at 153; *Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 252-53 (4th Cir. 2021)).

48. There is a causal connection between the complained-of conduct (making claims decisions under Medicare Advantage Program and validating claims) and Blue KC's federal authority; namely its authority to remit payment to providers under the Medicare Advantage program. *See Trinity Home,* 2023 WL 2573914, at *3-4 (holding the relationship with CMS and a Medicare Advantage Organization was "unusually close" and therefore sufficient to support federal officer jurisdiction removal) (citing *Watson,* 551 U.S. at 151-52.).

49. Though Blue KC exited the Medicare Advantage marketplace as of January 1, 2025, it served as a Medicare Advantage Organization prior to that date and during the period at issue in Plaintiff's Petition. Petition, ¶¶ 16, 55.

50. Upon information and belief, Blue KC acted in compliance with detailed federal regulations governing Medicare Advantage Organizations and when engaging in the conduct that forms the basis of Plaintiff's complaint.

51. Plaintiff's Petition also raises a dispute with respect to Blue KC's performance of its role as a "carrier" with respect to FEP claims. *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1227 (8th Cir. 2012).

52. Plaintiff asserts in this action, among other claims, claims for damages involving various federal laws and regulations governing FEBHA.

53. The "clinical validation audits" that form the basis of Plaintiff's claims are performed by Blue KC in its role as a carrier for the Service Benefit Plan with respect to claims submitted by Plaintiff for medical services provided to participants in the Service Benefit Plan.

54. Blue KC acted under federal direction when it engaged in the conduct of which Plaintiff complains.

55. "Government contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring or supervision." *Jacks*, 701 F.3d at 1231 (citation omitted). Blue KC's role as a carrier for the FEP is such a relationship. *Id.* at 1233. "At all times, [Blue KC] is subject to OPM oversight, uniquely operates with the United States Treasury, submits to OPM's regulatory requirements, and ultimately answers to federal officers. *Id.* at 1234.

56. For example, OPM requires carriers for the FEP to develop programs to "prevent, detect, and identify persons and organizations" engaged in fraud, waste or abuse. U.S. Office of Personnel Management, FEHB Program Carrier Letter No. 2017-13 (Nov. 20, 2017), available at https://www.opm.gov/healthcare-insurance/carriers/fehb/2017/2017-13.pdf. "Abuse"

8

includes, among other things, "misusing codes on the claim (i.e., the way the service is coded on the claim does not comply with national or local coding guidelines or is not billed as rendered)." *Id.*; *see also, e.g.,* 48 C.F.R. § 1609.70(b)(8) (requiring FEHBA carriers to safeguard FEHBA funds against waste and loss).

57.  FEHBA may withdraw approval of a carrier for its failure to "assure that the plan provides properly paid or denied claims…." *Id.* at 1609.70(c)(6).

58. There is also a causal connection between the complained-of conduct and Blue KC's federal authority, the complained-of audits "unquestionably occurred while [Blue KC] performed its duties under the direction of a federal officer or agency." *Jacks v. Meridian*, 701 F.3d at 1230 n.3.

59. Blue KC has several colorable federal defenses to the claim including but not limited to Blue KC's compliance with federal law, absence of illegality under federal law, and preemption pursuant to 42 CFR § 422.402, 5 U.S.C. § 8902(m)(1); and 42 U.S.C. 1395w-26(b)(3).

## FEDERAL QUESTION JURISDICTION

60. Alternatively, the Court may exercise diversity jurisdiction over this action.

61. Pursuant to 28 U.S.C. § 1331, this Court "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

62. A case "arises under federal law" within the meaning of 28 U.S.C. § 1331 if the plaintiff's right to relief necessarily depends on a substantial question of federal law. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983).

63. Plaintiff's cause of action not only implicates but is fully dependent on a purported act "unlawful" under federal law. It is, therefore, necessarily dependent on a dispositive interpretation of federal law. *See* Petition ¶ 32.

9

64. The relief sought necessarily depends on a substantial question of federal law because the claim as pled requires Plaintiffs to prove conduct unlawful under the Medicare Advantage Program, 42 C.F.R. Part 42 and other unidentified federal law and regulations.

65. Further, when a claim "relates to any employee benefit plan" under ERISA's preemption provision, 29 U.S.C. § 1144(a), "and the claim seeks to recover benefits due or enforce rights under the terms of a plan, 29 U.S.C. § 1132(a), such that the exclusive cause of action is under federal law," the entire case is removable. *See Neumann v. AT&T Comm'n, Inc.*, 376 F.3d 773, 779-80 (8th Cir. 2004).

66. A portion of the claims sought by Plaintiff involve benefits under ERISA plans.

67. ERISA completely preempts some or all of Plaintiff's state law claims insofar as the claims arise from the administration of ERISA-governed benefit plans.

## THE NOTICE OF REMOVAL IS PROPER

68. Blue KC has not yet been served with the summons or Petition and the removal takes place within one year of the date on which the Petition was filed. Thus, this Notice of Removal is timely under 28 U.S.C. § 1446(b).

69. Venue of this civil action is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1441(a).

70. Contemporaneously herewith, Blue KC files a copy of this Notice in the Circuit Court of the County of Jackson, State of Missouri, in accordance with 28 U.S.C. § 1446(d).

71. Also contemporaneously herewith, Blue KC provided Plaintiff with a copy of this Notice, pursuant to 28 U.S.C. § 1446(d).

72. Also filed is the requisite Civil Cover Sheet.

73. For all of the foregoing reasons, this Court has federal question, federal officer, and diversity jurisdiction over this lawsuit and removal is, therefore, proper.

10

74. If the Court exercises federal question jurisdiction over only a portion of the claims, this Court may exercise supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

**WHEREFORE**, Blue KC respectfully removes this action from the Circuit Court of the County of Jackson, State of Missouri, bearing Case No. 2516-CV20838 to this Court, and respectfully requests that this Court exercise its jurisdiction over this action, and grant such other relief as the Court may deem just and proper.

Respectfully submitted,

**LASHER HOLZAPFEL SPERRY & EBBERSON**

By: */s/ Aaron E. Schwartz*
Aaron E. Schwartz, Mo. Bar #58745
601 Union Street, Suite 2600
Seattle, WA 98101
206-654-1230
schwartz@lasher.com

***Attorneys for Defendant, Blue Cross and Blue Shield of Kansas City***

11

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 2nd day of July 2025, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system. A copy of these documents will also be mailed and emailed to counsel for Plaintiff:

M. Courtney Koger
2405 Grand Blvd., Suite 600
Kansas City, MO  64108
Tel: 816-960-0900
Fax: 816-960-0041
Courtney.Koger@KutakRock.com

/s/ *Aaron E. Schwartz*

EXHIBIT A

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

☒ AT KANSAS CITY  ☐ AT INDEPENDENCE

**RE**:  **SHAWNEE MISSION MEDICAL CENTER V. BLUE CROSS AND B**
**CASE NO:**  **2516-CV20838**

**TO:**  **M. COURTNEY KOGER**
**2405 Grand Boulevard**
**Suite 600**
**KANSAS CITY, MO  64108**

We have received pleadings, which you submitted for filing in the case and they have been file-stamped on <u>07/01/25</u>. However, your pleading cannot be processed further until the following action is taken:

**RULE 3.2 - STYLE**
☐ Additional service instructions are needed.
☐ Incorrect case number/filed in wrong county.
☐ Document is unreadable.

**RULE 4.2 (2)**
☒ Need Circuit Court Form 4

**RULE 5.6 – COLLECTIONS OF DEPOSIT**
☐ No fee, or incorrect fee, received; fee required is $_____.
☐ Insufficient Filing Fee; Please Remit $_____
☐ No signature on check/form 1695.
☐ No request to proceed in forma pauperis.
☐ No personal checks accepted.

**RULE 68.1**
☐ Need Circuit Court Form 17

**RULE 68.7 – VITAL STATISTICS REPORT**
☐ Need Certificate of dissolution of marriage form.

**RULE 74.14 SUPREME CT – FOREIGN JUDGMENT**
☐ Authentication of foreign judgment required.
☐ Affidavit pursuant to Supreme Court Rule 74.14

**RULE 54.12  SERVICE IN REM OR QUASI IN REM ACTIONS**
☐ Affidavit for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Order for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Notice for Service by Publication required pursuant to Supreme Court Rule 54.12c.
☐ Affidavit for Service by Certified/Registered Mail pursuant to Supreme Court Rule 54.12b.

☒ **OTHER:**  **Per Local Court Rule 4.22, please submit a Form 4 - Confidential Civil Filing Information Sheet which can be found at https://www.16thcircuit.org/miscellaneous-forms. Please also refile both your motion and proposed order for private process server to include the 2025 PPS registration numbers. For questions please contact at 816-881-3970.**
☐ Please take the actions necessary to comply with the Circuit Court Rules and your request will be processed.
☐ The private process server listed is not on our approved list.
☐ Execution in effect. Return date _____. Request may be resubmitted within one week prior to return date.
☐ Supreme Court Rule 90.13 requires interrogatories be served with summons of garnishment.

<u>**If the filing was a new case, please be advised that unless the additional information marked is received within 30 days of the date of this notice this case will be dismissed pursuant to Rule 37.4 for failure to prosecute without prejudice, at the Plaintiff's cost.  Collection efforts will be pursued for these costs.**</u>

**Please refer to the Court's website at <u>www.16thcircuit.org</u> for Court Rules or Forms.**

Copies electronic noticed, faxed, emailed and/or mailed JULY 1, 2025 to:

COURT ADMINISTRATOR'S OFFICE
**DEPARTMENT OF CIVIL RECORDS**
CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

| | |
|---|---|
| JULY 1, 2025 | By _____ |
| Date | Deputy Clerk |

☒ 415 East 12th St., Kansas City, Missouri 64106
☐ 308 W. Kansas, Independence, Missouri 64050

# IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
## AT KANSAS CITY

SHAWNEE MISSION MEDICAL CENTER, INC. D/B/A ADVENTHEALTH SHAW,

PLAINTIFF(S),                                    CASE NO. 2516-CV20838

VS.                                              DIVISION 8

BLUE CROSS AND BLUE SHIELD OF KANSAS CITY,

DEFENDANT(S).

## NOTICE OF CASE MANAGEMENT CONFERENCE FOR CIVIL CASE
## AND ORDER FOR MEDIATION

___

NOTICE IS HEREBY GIVEN that this case is currently assigned to the Honorable BRYAN E ROUND and a Case Management Conference will be held with the Honorable BRYAN E ROUND on **20-OCT-2025** in **DIVISION 8** at **08:45 AM,** pursuant to Administrative Order. All Applications for Continuance of a Case Management Conference should be filed on or before Wednesday of the week prior to the case management setting. Applications for Continuance of a Case Management Conference shall comply with Supreme Court Rule and 16th Cir. R. 34.1. Continuance of a Case Management Conference will only be granted for good cause shown because it is the desire of the Court to meet with counsel and parties in all cases within the first 4 months that a case has been on file. All counsel and parties are directed to check Case.NET on the 16th Judicial Circuit web site at www.16thcircuit.org after filing an application for continuance to determine whether or not it has been granted.

A lead attorney of record must be designated for each party as required by Local Rule 3.5.1. A separate pleading designating the lead attorney of record shall be filed by each party as described in Local Rule 3.5.2. The parties are advised that if they do not file a separate pleading designating lead counsel, even in situations where there is only one attorney representing the party, JIS will not be updated by civil records department, and copies of orders will be sent to the address currently shown in JIS. Civil Records does not update attorney information from answers or other pleadings. The Designation of Lead Attorney pleading shall contain the name of lead counsel, firm name, mailing address, phone number, FAX number and E-mail address of the attorney who is lead counsel.

At the Case Management Conference, counsel should be prepared to address at least the following:

    a.      A trial setting;

    b.      Expert Witness Disclosure Cutoff Date;

    c.      A schedule for the orderly preparation of the case for trial;

    d.      Any issues which require input or action by the Court;

    e.      The status of settlement negotiations.

## MEDIATION

The parties are ordered to participate in mediation pursuant to Supreme Court Rule 17. Mediation shall be completed within 10 months after the date the case if filed for complex cases, and 6 months after the date the case is filed for other circuit cases, unless otherwise ordered by the Court. Each party shall personally appear at the mediation and participate in the process. In the event a party does not have the authority to enter into a settlement, then a representative of the entity that does have actual authority to enter into a settlement on behalf of the party shall also personally attend the mediations with the party.

The parties shall confer and select a mutually agreeable person to act as mediator in this case. If the parties are unable to agree on a mediator the court will appoint a mediator at the Case Management Conference.

Each party shall pay their respective pro-rata cost of the mediation directly to the mediator.

## POLICIES/PROCEDURES

Please refer to the Court's web page www.16thcircuit.org for division policies and procedural information listed by each judge.

/S/ BRYAN E ROUND
BRYAN E ROUND, **Circuit Judge**

Certificate of Service

This is to certify that a copy of the foregoing was mailed postage pre-paid or hand delivered to the plaintiff with the delivery of the file-stamped copy of the petition. It is further certified that a copy of the foregoing will be served with the summons on each defendant named in this action.

Attorney for Plaintiff(s):
M. COURTNEY KOGER, 2405 Grand Boulevard, Suite 600, KANSAS CITY, MO 64108

Defendant(s):
BLUE CROSS AND BLUE SHIELD OF KANSAS CITY
Dated: 02-JUL-2025                                     BEVERLY A. NEWMAN
                                                       Court Administrator



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>BRYAN E ROUND | Case Number: 2516-CV20838 | |
|---|---|---|
| Plaintiff/Petitioner:<br><br>SHAWNEE MISSION MEDICAL CENTER, INC.<br>D/B/A ADVENTHEALTH SHAW<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>M. COURTNEY KOGER<br>2405 Grand Boulevard<br>Suite 600<br>KANSAS CITY, MO 64108 | |
| Defendant/Respondent:<br><br>BLUE CROSS AND BLUE SHIELD OF KANSAS<br>CITY | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 | |
| Nature of Suit:<br>CC Contract-Other | | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** BLUE CROSS AND BLUE SHIELD OF KANSAS CITY
**Alias:**
MARK A. NEWCOME, REG. AGENT
1400 BALTIMORE AVE.
KANSAS CITY, MO 64105

*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

<u>02-JUL-2025</u>
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

**Note to serving officer:** Summons should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____ a person at least 18 years of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

*(Seal)*

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date

_____
Notary Public

| **Sheriff's Fees** | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $ 10.00 | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| **Total** | $_____ | |

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (11/2021) SM30 (JAKSMCC) For Court Use Only: Document ID# 25-SMCC-701  1 of 1 Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:25-cv-00513-JAM   Document 1   Filed 07/02/25   Page 17 of 58

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

6/2020

Electronically Filed - Jackson - Kansas City - July 01, 2025 - 03:28 PM

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY, MISSOURI

SHAWNEE MISSION MEDICAL CENTER,
INC. (d/b/a ADVENTHEALTH SHAWNEE
MISSION),

      Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD OF
KANSAS CITY,

Serve:
Mark A. Newcome
Registered Agent
1400 Baltimore Ave.
Kansas City, MO 64105

      Defendant.

Case No.

Division No.

## **PETITION**

Plaintiff Shawnee Mission Medical Center, Inc., d/b/a AdventHealth Shawnee Mission ("Advent"), by and through its counsel of record, and for its Petition, states and alleges as follows:

## I. INTRODUCTION

This case challenges Blue Cross and Blue Shield of Kansas City's long-standing scheme to wrongfully and artificially reduce payment to Advent for hospital inpatient services through an improper BCBSKC revenue-generation practice called "clinical validation audits." Through this practice, BCBSKC and its agents, improperly reject the medical diagnoses of Advent's licensed physicians, determine those documented medical diagnoses to be clinically "invalid" under BCBSKC's own secret and dubious criteria, and use the process to unlawfully deny, recoup, offset, or otherwise misappropriate millions of dollars in payment rightfully earned by and owed to Advent. Not only are these clinical validation audits (and their resulting monetary offsets)

unauthorized under the Agreement between BCBSKC and Advent, but these audits also violate state law and federal regulations. BCBSKC's secret processes for determining that the diagnoses of Advent's licensed physicians are "clinically invalid" is alarming because BCBSKC's determinations about patients' medical diagnoses have been made by unknown individuals with unidentified credentials pursuant to undisclosed contracts under undisclosed diagnostic criteria working for third-party contractors with unknown payment arrangements and financial incentives.[1]

BCBSKC's unlawful and unethical actions undermine the fundamental principle that healthcare decisions in America should be made by doctors, with the medical expertise, legal responsibility and accountability for making treatment decisions for their patients and should not be made by auditors, accountants or artificial intelligence devices. These wrongful actions moreover have been taken arbitrarily, without prior notice of the criteria for BCBSKC's decisions, nor any meaningful review or appeal process to correct the erroneous actions taken by BCBSKC's vendors. For the reasons set forth below, BCBSKC's continued violation of its agreements, applicable laws, and industry standards must be stopped and BCBSKC should be held to answer in damages and other relief.

## II. NATURE OF THE CASE

1.      AdventHealth Shawnee Mission ("Advent"), a Kansas not-for-profit corporation, has been a contracted hospital with Blue Cross and Blue Shield of Kansas City ("BCBSKC") since at least November 1, 2002. The parties entered into a Hospital Network Agreement (as amended, the "Agreement") for Advent to participate in certain BCBSKC provider networks and provide

---

[1] Because BCBSKC has refused to disclose the terms of its contracts with its audit vendors, Advent does not know the specific payment arrangements, but on information and belief, believes these arrangements contain improper incentives to deny payment of valid Advent claims for services and involve individuals without a medical license rendering opinions on medical diagnoses.

Covered Services (defined below) to Covered Individuals. Advent provides a wide array of medical care to the residents of Kansas and Missouri.

2. BCBSKC, a Missouri not-for-profit health services corporation with its principal place of business in Jackson County, Missouri, agreed to pay Advent negotiated Payment Rates under the Agreement and its Exhibits, Attachments, Schedules, and Addenda. Payment Rates for hospital inpatient services are primarily based on diagnostic related groups ("DRG") which are derived based on the diagnoses and procedures documented in patients' medical records and which are reported as codes on Advent's claims for reimbursement. Diagnosis and procedure billing codes and resulting DRGs are assigned and reported based on ICD-10-CM Official Guidelines for Coding and Reporting under federally mandated code sets for hospital inpatient services.

3. Through its ongoing clinical validation audits, BCBSKC has failed to pay, recouped, offset, or otherwise wrongfully recovered over $2 million from Advent by refusing to remit the Payment Rates that correspond with the DRGs submitted to BCBSKC on claims for reimbursement based on determined diagnoses established by Advent's licensed physicians. Instead, in league with its agents or contractors, BCBSKC has repeatedly disregarded certain diagnosis codes on Advent's claims for reimbursement, asserting that Advent's licensed healthcare professionals' documented medical diagnoses are "clinically invalid." BCBSKC's calls its process for ostensibly determining if a patient truly possesses the conditions documented in the medical record "clinical validation."

4. In its clinical validation audits, BCBSKC acknowledges an Advent physician, an individual with personal knowledge of and legal responsibility for the diagnosis of the patient, established and documented the medical diagnoses of such patient. Nonetheless, BCBSKC erroneously opines that clinical evidence in a patient's medical record does not clinically

- 3 -

substantiate the licensed doctor's documented diagnoses. BCBSKC's determinations to clinically invalidate physicians' diagnoses are purportedly based on criteria from various sources, but such criteria have never been disclosed to Advent in advance. Upon information and belief, the criteria are often based on outdated literature, irrelevant medical guidance, or publications that do not reflect an industry standard definition for medical diagnoses. In some instances, BCBSKC has even manipulated the text of the exact references BCBSKC cited to defend its decisions to clinically invalidate diagnoses from Advent's physicians and thereby reduce the Payment Rate owed to Advent.

5.  To Advent's knowledge, BCBSKC has not raised any concerns with the quality of Advent healthcare professional's quality of care, despite finding more than 350 of their medical diagnoses clinically invalid and unsupported.

6.  BCBSKC's clinical validation audits provides benefits only to BCBSKC through improper cost reduction and withholding portions of the Payment Rate earned by and due to Advent, while receiving and retaining the benefit of quality medical care for itself and its Covered Individuals.

7.  BCBSKC's clinical validation audits only target hospital inpatient claims that contain diagnoses which have an impact on the DRG assigned. These diagnoses are assigned classifications called major comorbidities and complications ("MCCs") or comorbidities and complications ("CCs"). The presence of one or more MCCs or CCs on a claim form may cause the DRG reported to change and lead to a higher Payment Rate commensurate with additional resources often involved in evaluating, diagnosing, and treating conditions designated as MCCs or CCs. BCBSKC's clinical validation audits are not designed to review claims for medical

diagnostic accuracy overall, but rather they are strategically targeted at commonly assigned MCC or CC diagnoses that, if rejected, impact and reduce the Payment Rate.

8.      BCBSKC has contracted with various outside vendors to perform clinical validation audits, without authorization or approval of Advent, without disclosure of the qualifications of those reviewing documentation, and without providing to Advent the criteria that will be used to dictate specific definitions of medical diagnoses during these reviews. BCBSKC has, on information and belief, improperly provided its clinical validation vendors with Advent's Confidential Information, protected by the parties' Agreement, without consent of Advent and without providing any information about the vendors' contracts, work or incentives in order to render decisions adverse to Advent but which benefit BCBSKC's bottom line.

9.      Advent believes BCBSKC's clinical validation procedures and recoupments violate a number of contractual and statutory provisions, including:

     a.      Requirements to notify Advent 30 days prior to material changes to BCBSKC's rules, regulations, procedures, and administrative policies;

     b.      Confidentiality provisions in the parties' Agreement;

     c.      Prohibition on initiating recovery on amounts allegedly paid in error more than 12 months from the date of payment;

     d.      Prohibition on recovering amounts related to Medical Necessity;

     e.      Prohibition on the engagement in, the unauthorized practice of medicine by rendering opinions on, and altering, patients' diagnoses by unlicensed individuals;

     f.      Deceptive acts and practices.

10.      In internally appealing these recoupment decisions by BCBSKC, Advent has incurred extensive costs and resources, and its appeals have been summarily and arbitrarily rejected. Advent is entitled to declaratory and injunctive relief and damages, in an amount

- 5 -

exceeding $2 million dollars, based on BCBSKC's unlawful, unethical, and deceptive practices and breaches of the parties' Agreement.

## III. JURISDICTION AND VENUE

11.     Jurisdiction in this Court is proper under R.S.Mo. § 478.070.

12.     Venue in this Court is proper under R.S.Mo. § 506.290.

13.     Advent makes claims pursuant to the laws of the State of Missouri, including under the parties' contractual Agreement. It does not make any claims under any federal law or regulation. Nor does Advent make any claim as assignee of benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), nor does Advent claim or seek coverage or benefits on behalf of any patient, and expressly waives same. Advent's claims are not based on the relationship between any insured and insurer, but are based on the contractual and business relationships between Advent and BCBSKC, and the legal duties BCBSKC owes to Advent.

## IV.  STATEMENT OF RELEVANT FACTS AND RULES

### A.      Identification and Relationship of the Parties

14.     Advent is an acute-care facility licensed as such under the laws of the States of Kansas and Missouri. In addition to the hospital itself, Advent operates, among other things, freestanding outpatient surgery centers, therapy centers, imaging centers, a home health agency, a community health education building, five physician office buildings and an associate childcare center.

15.     BCBSKC is a health services corporation, health maintenance organization, and third-party administrator under the laws of Missouri.[2]

---

[2] *See* tax ID number 43-1257251, SBS Company Numbers 104346401, 104342645, 104342644, 104342981 from the National Association of Insurance Commissioners.

- 6 -

4898-0622-2402.10

16.     BCBSKC reimburses healthcare providers for delivering covered healthcare services to BCBSKC Covered Individuals. BCBSKC is the largest provider of health insurance plans in a 32-county service area covering greater Kansas City and northwest Missouri. According to its website, BCBSKC's mission is: "To provide affordable access to healthcare and to improve the health of our members." Far from adhering to its mission statement, BCBSKC's actions appear strategically designed to improve its balance sheet rather than to promote access to healthcare or improve the health of its members. Indeed, BCBSKC, citing "financial pressures," announced it would exit the Kansas City Medicare Advantage market in 2025. https://www.bluekc.com/press-release/blue-kc-to-exit-medicare-advantage-market-in-2025-2/

17.     The Agreement, inclusive of the amendments and exhibits, requires Advent to provide Covered Services to Covered Individuals on the terms and conditions of the Agreement and the provisions of it's Product Addenda. Relevant definitions in the Agreement include the following:

"Covered Individual" means any person entitled and appropriately enrolled to receive Covered Services through a BCBSKC Product pursuant to the terms of a Benefit Plan.

"Covered Services" means those Medically Necessary professional and hospital services and supplies which are provided pursuant to the terms of this Agreement and the Benefit Plan under which the Covered Individual being treated is covered.

"Medically Necessary or Medical Necessity" means services and supplies which are determined by Payor in its discretion or under the terms of the applicable Benefit Plan or as may be required under applicable law, including and subject to the grievance and appeals processes under such Benefit Plan, essential to the health of a Covered Individual and are: (i) provided for the diagnosis or care and treatment of a medical or surgical condition; (ii) appropriate and necessary for the symptoms, diagnosis or treatment of a medical condition; (iii) within standards of medical practice recognized within the local medical community; (iv) not primarily for the convenience of the Covered Individual, nor the Covered Individual's family, physician or another provider; (v) consistent with the attainment of achievable outcomes; and (vi) reasonably calculated to result in the highest achievable level of physiological and psychological functioning and well-being of the Covered Individual.

- 7 -

18.   Under Section 6.3 of the Agreement, BCBSKC is responsible for paying Advent for Medically Necessary Covered Services within 30 days:

6.3   Processing and Payment of Claims by Payor. Upon receipt of a complete and accurate bill for Advent Service[3] which has been certified as Medically Necessary, BCBSKC will process the claim or transmit the claim to Payor for payment in accordance with the Benefit Plan and in accordance with the Payment Rate, net of amounts recoverable from other third-party payors through coordination of benefits and net of any applicable Copayments, Coinsurance or Deductibles for all Covered Individuals admitted to Advent. Payor shall pay Advent for Covered Services in accordance with the Payment Rates contained in each BCBSKC Product-specific Addendum to this Agreement or notify Advent that payment shall be delayed, and the reason therefor. Such payment shall normally be made within thirty (30) days after receipt of Advent's final and complete claim for Covered Services. For any claims to which the provisions of Mo. Ann. Stat. § 376.383 (West 2024) apply, any clean claims received by BCBSKC from either Missouri-licensed or Kansas-licensed Network Providers and not paid within forty-five days after receipt shall be subject to interest charges. BCBSKC shall timely notify Advent of incomplete claims submitted by Advent.[4]

19.   The Agreement allows BCBSKC to conduct audits and to initiate recovery related to billing code errors but not matters involving Medical Necessity:

6.7   BCBSKC Right to Audit. Payor may conduct reasonably scheduled audits and/or reviews during Advent's regular business hours. . . . Payor may recover or offset any amount related to billing code errors and other matters **not involving Medical Necessity**.

Agreement § 6.7 (emphasis added).

20.   The Agreement also required BCBSKC to maintain the confidentiality of Advent's proprietary and confidential information:

1.11   Confidentiality of Business Information. Each party recognizes that in the course of performance of this Agreement it may become aware of information that the other party deems confidential and/or proprietary and wishes to share outside its own organization only under limited circumstances or not at all. Each party agrees that it will not actively seek out such information, which includes, but is not limited to, discounts, negotiated rates, fee schedules and any other financial, marketing or contractual information that a party would reasonably know to be confidential information or a trade or proprietary secret, except to the extent reasonably necessary to allow the party to perform its duties under this

---

[3] "Advent Service" is not defined in the Agreement.

[4] Amendment One, § 14.

Agreement. In the event that a party becomes aware of such data or information, from whatever source or for whatever purpose, each party agrees that it shall hold such information to be confidential and shall not reveal such information to any third party for any purpose. Each party agrees that this Section 1.11 shall survive termination of the Agreement and shall inure to the benefit of the parties, their successors and permitted assigns. Advent agrees that it is responsible to educate its staff, and to be responsible for their conduct, with regard to obtaining and using confidential business information.

21.     The Agreement requires that medical and treatment decisions will be made only by Advent, not by BCBSKC or its agents: "Nothing shall be construed to give BCBSKC or any of its . . . agents . . . the right to interfere with the prescribed care and treatment given by Advent to Covered Individuals."[5]

22.     Although Section 10.6 of the Agreement contains an agreement to arbitrate payment disputes, it deprives the arbitrators of any power to adjudicate disputes relating to the discretion or medical judgment of either party:

> 10.6.3 The arbitrators may construe or interpret but shall not vary or ignore the terms of this Agreement and shall be bound by controlling law, including administrative determinations. Moreover, *where pursuant to the terms of this Agreement or governing law the disputed decision or determination is one which is committed to the discretion or medical judgment of either party, the arbitrators shall not disturb that decision or determination*.

Agreement § 10.6.3 (emphasis added).

23.     For this reason, this Court and the Missouri Court of Appeals have previously found such disputes are not subject to arbitration under the BCBSKC agreement. *Manfredi v. Blue Cross & Blue Shield of Kansas City*, 340 S.W.3d 126, 129–30 (Mo. Ct. App. 2011).

**B.     Summary of Claim Submission Requirements and Audit/Appeal Procedures**

24.     Advent is required to submit claims in accordance with ICD-10-CM Official Guidelines for Coding and Reporting under HIPAA standard transaction rules.[6]

---

[5] Agreement, § 1.4.
[6] 79 Fed. Reg. 45128 August 4, 2014.

- 9 -

25. The Agreement, BCBSKC General Coding and Billing Policy, and Post Service Claim Review Policy similarly require assigning diagnosis code(s) consistent with Covered Individuals' medical records.[7]

26. The Agreement allows BCBSKC to conduct reasonably scheduled audits to verify services that were reported to BCBSKC, to verify Medical Necessity of Services and quality of care, and recover or offset for billing errors, but the Agreement does not allow for offsets related to Medical Necessity.[8]

27. Medical Necessity means services essential to the health of a Covered Individual for the diagnosis or care and treatment of a medical or surgical condition.[9] Medical Necessity requires a determination that services are appropriate for the symptoms, diagnosis, and treatment of a medical condition and consistent with acceptable medical practice.[10]

28. Upon receipt of a complete and accurate bill for a Covered Services, BCBSKC must process the claim or transmit the claim for payment within 30 days in accordance with RSMo § 376.383. BCBSKC is required to timely notify Advent if a claim is incomplete.[11]

---

[7] Agreement § 6.2, Post Service Claim Review Payment Policy POL-PP-212. BCBSKC has added, modified, discarded, and altered dozens of policies, guides, manuals and other "guidance" and directives since the Agreement was adopted more than 20 years ago. Advent does not concede that any such later-adopted policies or guides have been properly incorporated into or become operative the terms of the Agreement and reserves all rights relating the effectiveness or enforceability of any such policy or guideline. *See State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 810-11 (Mo. 2015) (explaining that to incorporate terms outside of the contract, the contract must make clear reference to documents and describe it in such terms that its identity may be ascertained beyond reasonable doubt); *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 436 (Mo. 2003) (holding that mere reference to another document does not establish a clear intent to incorporate the document); *U.S. for Use of Lighting & Power Servs., Inc. v. Interface Constr. Corp.*, 533 F.3d 1150, 1155 (8th Cir. 2009) (finding that under Missouri law a contract cannot incorporate by reference a second contract that is not yet in existence).
[8] Agreement § 6.7. *See also* Post Service Claim Review Payment Policy POL-PP-212 "Claims being reviewed to validate the correct diagnosis related group (DRG) assignment/payment (DRG validation audits)." BCBSKC's policies make no reference to clinical validation reviews.
[9] Agreement, Definitions.
[10] *Id.*
[11] Agreement § 6.3.
[12] This "Provider Office Guide" has neither been made part of the parties' Agreement (*see supra* note 7), nor does it purport to apply to facilities as opposed to individual professionals, but is noted for illustrative purposes. Advent does not concede the Provider Office Guide is enforceable against it and accordingly reserves all rights to challenge its effectiveness and enforceability.

- 10 -

29.     RSMo § 376.384 prohibits health carriers from requesting a refund or offsetting against a claim more than 12 months from the date of payment. Violations are subject to penalties and interest.

30.     BCBSKC's Provider Office Guide explains "[BCBSKC] may initiate recovery from you or offset against other claims [BCBSKC] received from you. [BCBSKC] will not pursue recovery of an overpayment if the recovery is not initiated within 12 months of [BCBSKC's] payment."

31.     BCBSKC's Post Claim Review Policy represents it is intended to "ensure that billing is conducted in accordance with official guidelines for coding and reporting."[12] With respect to clinical validation audits, BCBSKC's policy discusses its intent to address practices only where there is an "*absence* of objective clinical information in the medical record to support a medical condition." Nothing in the policy notifies Advent of BCBSKC's intent to unilaterally deem clinical evidence insufficient to support a medical condition, nor to authorize BCBSKC to determine what criteria justify any particular medical diagnosis.

32.     Pursuant to the Agreement, if BCBSKC claims it has identified an overpayment related to billing code errors, it may initiate a recovery or an offset, but not for matters involving Medical Necessity.[13] If Advent disagrees an overpayment has occurred, in whole or in part, Advent may initiate a dispute. During the investigation of the dispute, the overpayment record will be placed on hold to ensure BCBSKC does not perform an automatic recovery until the dispute is resolved.[14]

---

[12] Post Service Claim Review Payment Policy POL-PP-212. *See supra*, note 7.
[13] Agreement § 6.7.
[14] BCBSKC Blue Medicare Advantage Provider Reference Guide 2021, page 77.

- 11 -

33.    For several years, BCBSKC, through its vendors, conducted numerous unauthorized and improper clinical validation audits of Advent's claims. These clinical validation audits typically resulted in an opinion that an overpayment was made to Advent because BCBSKC's out-state, unlicensed audit contractor invalidated the medical diagnosis established by Advent's licensed healthcare providers, an action which by itself is unlawful, unethical and in violation of the parties' Agreement. When Advent appeals these audit findings through BCBSKC's (or its vendors') internal appeals process, Advent's appeals have been summarily and arbitrarily rejected. Indeed, BCBSKC's auditors market their services based, in part, on how uniformly they uphold their own audit findings. As set forth more fully below, BCBSKC's actions violate the terms of the Agreement and state laws and public policy. For these reasons, Advent is entitled to damages and injunctive relief.

### C.    Background Regarding Clinical Validation Audits

34.    "Clinical validation" audits originated from a Medicare Statement of Work under the Recovery Audit Contractor Program (the "RAC Program") in 2011 in which Medicare defined "clinical validation" as a clinical review of the case to determine whether or not the patient truly possessed the conditions documented in the medical record, and clinical validation typically was performed by a clinician (RN, MD, or therapist). "Clinical validation is beyond the scope of DRG (coding) validation, and the expertise and licensure of a certified coder. This type of review **may only be performed properly by a clinician** or may be performed by a clinician with approved coding credentials."[15] Medicare currently prohibits its Recovery Audit Contractor ("RAC") reviewers from conducting clinical validation reviews.

---

[15] CMS RAC Statement of Work, 2011, ICD-10-CM Coding Clinic 2016 Quarter 4, pages 147-149.

4898-0622-2402.10

35.     DRG validation is a review process to confirm billing codes are submitted in accordance with transaction code set standards[16] DRG validation is based on accepted principles of coding practice, consistent with guidelines established for International Classification for Disease ("ICD") coding, the Uniform Hospital Discharge Data Set data element definitions.[17] Under a DRG validation and these industry coding rules, "diagnosing a patient's condition is solely the responsibility of the provider. Only the physician, or other qualified healthcare practitioner legally accountable for establishing the patient's diagnosis can 'diagnose' the patient."[18] "Coding must be based on provider's documentation."[19] Diagnosis codes are "based on his/her documentation, not on a particular clinical definition or criteria."[20] "For example, if the physician documents sepsis, and the coder assigns the code for sepsis, and a clinical validation review later disagrees with the physician's diagnosis, **that is a clinical issue, but it is not a coding error**." (emphasis added)[21] BCBSKC's auditors describe their reviews as "Clinical Chart Validation" and function as clinical validation reviews—acknowledging physician documentation of medical diagnoses but disagreeing with the treating physician's diagnosis.

   *1.     ICD-10-CM Official Guidelines for Coding and Reporting*

36.     The ICD-10-CM Official Guidelines for Coding and Reporting FY 2021 (October 1, 2020 – September 30, 2021) ("ICD-10-CM Official Guidelines") state that code assignment is based on the documentation by the patient's provider (i.e., physician or other qualified healthcare practitioner legally accountable for establishing the patient's diagnosis). "The assignment of a diagnosis code is based on the provider's diagnostic statement that the condition

---

[16] *See* CMS Pub. 100-08 Ch. 3, Section 6.5.3; American Hospital Association Coding Clinic 2016, Quarter 4, pages 147-149.
[17] *See* CMS Pub. 100-08 Ch. 3, Section 6.5.3.
[18] American Hospital Association Coding Clinic 2016, Quarter 4, pages 147-149. (emphasis added).
[19] *Id.*
[20] *Id.*
[21] *Id.*

exists. The provider's statement that the patient has a particular condition is sufficient. **Code assignment is not based on clinical criteria used by the provider to establish the diagnosis**."[22]

37.     Under billing code rules, "as long as [the condition] is documented, regardless of how the diagnosis was arrived at, the code for [the condition] can be assigned".[23]

38.     If a physician documents a condition, the hospital medical coder assigns a diagnosis code for the condition, then later a clinical validation auditor disagrees with the physician's diagnosis—that is a clinical issue but is not a billing code error.[24]

### 2.     *Coverage Decisions Under Medicare and Medicare Advantage*

39.     Many of BCBSKC's clinical validation audits have audited Advent claims for services rendered to members of Medicare Advantage plans.

40.     Medicare Advantage Organizations (MAOs, or 'MA Plans') are required to cover and pay for basic Medicare benefits for their members, and must do so in a manner that is no more restrictive than traditional Medicare, including the type or level of service. Effective at the very least for services beginning in 2024, MA Plans cannot create policies that dictate specific definitions of diagnoses unless those criteria meet certain limited parameters.[25] Those parameters include making coverage criteria publicly available and based upon widely used treatment guidelines, or upon high quality clinical literature.

41.     Traditional Medicare covers hospital inpatient services at the level described by various DRGs, which are determined by reporting diagnosis and procedure codes in accordance with ICD-10-CM Official Guidelines for Coding and Reporting and healthcare professional documentation in the medical record.

---

[22] ICD-10-CM Official Guidelines for Coding and Reporting Section I.A.19.
[23] ICD-10-CM Coding Clinic 2016 Quarter 4, pages 147-149.
[24] ICD-10-CM Coding Clinic 2016 Quarter 4, pages 147-149.
[25] 42 C.F.R. 422.101; *See* generally 88 Fed. Reg. 22120 (April 2023).

- 14 -

42.     Medicare does not dictate specific definitions of medical diagnoses, nor does traditional Medicare perform clinical validation reviews of hospital claims.

43.     Medicare currently even prohibits RAC reviewers from conducting clinical validation reviews entirely.[26]

44.     Outside of the RAC Program, CMS only permits validation of inpatient DRGs by "reviewing the medical record for medical necessity and DRG validation."[27] The purpose of DRG validation is to ensure that diagnostic and procedural information and the discharge status of the beneficiary, as coded and reported by the hospital on its claim, matches both the attending physician's description and the information contained in the beneficiary's medical record.[28] Clinical validation is distinct and separate from DRG validation. Under the Medicare program, then, any permissible review of an inpatient DRG other than DRG validation is a review for medical necessity.

45.     MA plans may create their own billing and payment procedures as long as all providers are paid accurately, timely, and with an audit trail.[29] However, MA plans' creation of coverage criteria is subject to limitations under federal regulations.

46.     Coverage decisions for Medicare Advantage plans are any determination (i.e., an approval or denial) made by an MA Plan, or its delegated entity, with respect to the following:

A.     Payment for any other health services furnished by a provider (other than the MA Plan), that the enrollee believes are covered under Medicare, or if not covered under Medicare, should have been furnished, arranged for, or reimbursed by the MA Plan;

---

[26] *See* CMS Inpatient Advent MS-DRG Coding Validation Issue Name 0001 - Inpatient Advent MS - DRG Coding Validation.

[27] IOM 100-08 Chapter 6, Section 6.5.3.

[28] IOM 100-08 Chapter 6, Section 6.5.3.

[29] Some Medicare Advantage Organization Denials of Prior Authorization Requests Raise Concerns About Beneficiary Access to Medically Necessary Care" (OEI-09-18-00260) (hhs.gov).

B.      Refusal to authorize, provide, **or pay** for services, in whole or in part, including the type or level of services, which the enrollee believes should be furnished or arranged by the MA Plan[30];

C.      Reduction, or premature discontinuation, of a previously authorized ongoing course of treatment; or

D.      Failure of the MA Plan to approve, furnish, arrange for, **or provide payment** for health care services in a timely manner, or to provide timely notice of an adverse determination, such that a delay would adversely affect the health of the enrollee.[31]

47.      In accordance with 42 C.F.R. §§ 422.562(a)(4) and 423.562(a)(5), all MA Plans must employ a medical director who is responsible for ensuring the clinical accuracy of all coverage decisions made by the plan that involve medical necessity.

48.      Payment requests from a provider (claims for reimbursement) for a service already delivered to a patient is a request for a coverage determination, and the MA Plan's resulting decision to pay, or deny payment, of the provider's claim – in whole or in part – is a coverage determination.[32]

49.      The MA Plan's decision to approve or deny the payment request must be consistent with applicable rules for Medicare coverage and MA Plan billing.[33]

50.      If an MA Plan expects to issue a partially or fully adverse medical necessity (or any substantively equivalent term used to describe the concept of medical necessity) decision based on the initial review of the request, that determination must be reviewed by a physician or other

---

[30] 42 C.F.R. § 422.566(b)(3).

[31] Parts C&D Enrollee Grievances, Organization/Coverage Determination, and Appeals Guidance (cms.gov) Section 40.1.

[32] Some Medicare Advantage Organization Denials of Prior Authorization Requests Raise Concerns About Beneficiary Access to Medically Necessary Care (OEI-09-18-00260) (hhs.gov).

[33] Some Medicare Advantage Organization Denials of Prior Authorization Requests Raise Concerns About Beneficiary Access to Medically Necessary Care (OEI-09-18-00260) (hhs.gov).

- 16 -

appropriate healthcare professional with expertise in the field of medicine or healthcare that is appropriate for the services at issue, including knowledge of Medicare coverage criteria.[34]

51.    Providers may request a copy of the contents of the case file at any point during the appeals process.[35]

### 3.    *State Law Restrictions on the Practice of Medicine*

52.    In Missouri, "[i]t shall be unlawful for any person not now a registered physician within the meaning of the law to practice medicine or surgery in any of its departments, to engage in the practice of medicine across state lines or to profess to cure and attempt to treat the sick and others afflicted with bodily or mental infirmities, or engage in the practice of midwifery in this state, except as herein provided." RSMo § 334.010.

53.    For the purposes of RSMo § 334.010, the "practice of medicine across state lines" shall include "[t]**he rendering of a written or otherwise documented medical opinion concerning the diagnosis or treatment of a patient** within this state by a physician located outside this state as a result of transmission of individual patient data by electronic or other means from within this state to such physician or physician's agent." (emphasis added).

54.    Similarly, in Kansas, the practice of medicine includes **the diagnosis of human disease**.[36] It is further unlawful in Kansas for any individual or organization performing utilization review to be compensated or receive compensation which is contingent in any way upon frequency of certification denials, costs avoided by denial or reduction in payment of claims or other results

---

[34] 42 C.F.R. § 422.566(d).
[35] Parts C&D Enrollee Grievances, Organization/Coverage Determination, and Appeals Guidance (cms.gov) Section 50.5.2.
[36] K.S.A. § 65-28,133.

- 17 -

which may be adverse to the needs of the patient as determined by the attending healthcare provider.[37]

**D. BCBSKC's Clinical Validation Audits**

55. Upon information and belief, BCBSKC's clinical validation audit process has been in place since approximately 2013.

56. When a diagnosis is deemed clinically invalid as a result of a clinical validation audit, the DRG that BCBSKC will pay is recalculated as though the original medical diagnosis never existed. The resulting DRG has a lower weight and corresponding Payment Rate than the DRG reported on Advent's claim. The difference in payment reflects a refusal to cover and to pay for the incrementally more complex services associated with the DRG than Advent originally reported. BCBSKC's resulting decision represents a determination that the patient does not have a diagnosis to support the medical necessity of services described by the DRG than Advent originally and correctly reported based upon the treating physician's determination.

57. Prior to 2024, BCBSKC used a vendor, Cotiviti, based in New Jersey, to perform clinical validation audits. Since 2024, BCBSKC has used a vendor, Apixio (now called Machinify), based in Pennsylvania, to perform clinical validation audits of Advent's patients' medical diagnoses in Missouri and Kansas.

58. In their audits, both Cotiviti and Apixio generally admit that the condition at issue has been documented in the medical record by a physician or other healthcare professional whose scope of practice includes establishing diagnoses. Nonetheless, Cotiviti and Apixio, on behalf of BCBSKC, opine on the validity or invalidity of the physicians' medical diagnoses for Advent's patients. For example, Cotiviti frequently rendered its written opinion surrounding the invalidity

---

[37] K.S.A. § 40-22a07(a)(2).

- 18 -

of a medical diagnosis, explaining "upon further investigation, the diagnosis of [condition] was not substantiated clinically" or "there was insufficient clinical evidence to substantiate this condition." Similarly, Apixio's written opinions surrounding the invalidity of a medical diagnosis explain "the clinical picture is inconsistent with the presence of [condition]."

59. Upon information and belief, BCBSKC allowed and/or incentivized its vendors to establish and apply the vendors' own parameters to dictate specific definitions of medical diagnoses and has accepted its vendors' written opinions surrounding invalidity of Advent's medical diagnoses. Upon information and belief, BCBSKC relies almost entirely on its vendors' diagnostic findings, and such findings are not reviewed by a licensed physician.

60. BCBSKC failed and refused to make its vendors' review criteria or parameters dictating specific definitions of medical diagnoses available to Advent prior to imposing those criteria on claims retrospectively.

61. In addition, BCBSKC shared and disclosed Advent's Confidential Information, protected from disclosure by the parties' Agreement, to its vendors, without consent or permission, and without disclosing to Advent the terms of the agreements between BCBSKC and its vendors, or any protections in such agreements from further sharing of Advent's Confidential Information.

*1.* ***BCBSKC's Reviewers Are Not Physicians***

62. Cotiviti, a New Jersey vendor, has audited and opined on the invalidity of numerous of Advent's medical diagnoses. Cotiviti routinely acknowledged its audits were merely performed under the supervision of, but not by, "medical directors." Neither BCBSKC nor Cotiviti has disclosed its contract, the criteria used in its audits, the qualifications of the personnel making these diagnoses, the extent to which artificial intelligence (AI) is used in its processes, nor the financial terms and incentives in its agreements. Cotiviti's written determinations opining on the validity or invalidity of medical diagnoses are unsigned and do not identify the person (or device) who or

- 19 -

which concluded that treating professionals' medical diagnoses were invalid, who or which recommended BCBSKC reduce Advent's payments below the Payment Rate, and who rejected Advent's appeals. BCBSKC failed to provide and refused to obtain and distribute Cotiviti's specific definitions of medical diagnoses to Advent.

63. Apixio, a Pennsylvania vendor rebranding itself as "Machinify," markets itself as an AI payment integrity vendor. Since 2024, Apixio, on behalf of BCBSKC, has audited numerous of Advent's medical diagnoses, supplanted these diagnoses with its own diagnoses, or disregarded medical diagnoses entirely when reaching its opinions on the validity or invalidity of medical diagnosis. Neither BCBSKC nor Apixio has disclosed its contract, the criteria used in its audits, the qualifications of the personnel making these diagnoses, the extent to which artificial intelligence (AI) is used in its processes, nor the financial terms and incentives in its agreements. Apixio's written opinions are anonymous and do not provide a contact name or identify the person (or device) which concluded that treating professionals' medical diagnoses were invalid, who recommended BCBSKC reduce Advent's payments below the Payment Rate, and who denied Advent's appeals. BCBSKC failed and refused to provide Apixio's specific definitions of medical diagnoses to Advent.

64. Because Cotiviti's and Apixio's audits focused only on methods and strategies to remove or ignore diagnoses, BCBSKC's acceptance of Cotiviti's and Apixio's opinions surrounding the invalidity of medical diagnoses results in BCBSKC wrongfully paying Advent at a rate lower than the Payment Rate for the DRG that Advent accurately reported.

65. Upon information and belief, neither Cotiviti nor Apixio has ever performed an audit leading to a finding that Advent physicians missed an opportunity to capture a diagnosis code on claim reporting or recommended that Advent be paid at a rate for a more complex DRG. Nor

have their clinical validation audits identified clinically invalid diagnoses for any conditions that would have no effect on payment to Advent. Their exclusive focus on MCCs and CCs appears intentionally and strategically designed for the sole purpose of BCBSKC escaping responsibility to remit the full Payment Rate for the DRG Advent reports for reimbursement.

66.    Apixio heavily markets itself as an AI payment integrity solution. In fact, it characterizes its clinical chart reviews as "AI-as-a-Service":

AI-as-a-Service →          Payment Integrity
                            AI-powered clinical diagnosis insights
                            for clinical chart reviews

                            AI-AS-A-SERVICE OVERVIEW →

67.    Apixio's marketing portrays an aggressive payor-focused approach, suggesting a **staggering 60% of the hospital stays it reviews include clinically invalid medical diagnoses**. In other words, Apixio opines for its clients that licensed physicians erroneously diagnose patients in 60% of hospital inpatient stays Apixio reviews.

68.    Apixio boasts 99% "sustainability," indicating that Apixio refuses to change its decision upon hospitals' appeals 99% of the time.

69.    Apixio not only concedes the perfunctory nature of its audits, but markets its hasty reviews as a selling point, stating in its marketing materials that it "effortlessly conducts complex claims reviews in minutes, not days, with the support of an integrated platform that harnesses . . . AI-driven automated workflows."



70. Apixio often "insta-denies" Advent's appeals. When Advent's appeals are uploaded into Apixio's portal, a response maintaining its denial is returned momentarily, even in high-dollar, complex appeals numerous pages in length. Decisions on Advent's appeals rarely reflect a meaningful analysis and generally ignore the factual and legal grounds set forth in Advent's appeals, almost never involve any human contact or discussion between the parties.

Neither Apixio nor Cotiviti have discussed their new medical diagnoses with the treating professionals before usurping a medical diagnosis with their own opinion.

71. BCBSKC's vendors' reviews often contain factually inaccurate clinical findings when compared to the actual medical record. For example, one inpatient chart was reviewed to assess the clinical validity of the patient's diagnosed and billed acute respiratory failure. The vendor's determination letter states "there were no dated oxygen saturations less than 90%." This was the only reason given for suggesting acute respiratory failure was a clinically invalid diagnosis. Advent pointed out BCBSKC's vendor's error when Advent appealed, noting "SpO2 82% at home per EMS, treated with up to 4L nasal cannula, and respiratory rate as high as 26." Without any evidence supporting its opinion, BCBSKC's vendor suggested the patient's respiratory status "must also be present during the patient's hospital stay to be coded on the claim." None of the references BCBSKC's vendor cites support this conclusion.

### *2.* *BCBSKC Improperly Incentivizes Its Reviewers*

72. It is unknown how BCBSKC compensates its audit vendors, formerly Cotiviti and currently Apixio/Machinify. Cotiviti, the primary third-party reviewer formerly engaged by BCBSKC to perform reviews of Advent's DRG assignments, is a well-known contractor under the Medicare Recovery Audit Contractor program through which it is paid a contingency or incentive based of the amount of "overpayments" it claims to have identified.. Nor is it known how Cotiviti and Apixio/Machinify compensate or incentivize their employed or contracted reviewers to render decisions.

73. Missouri law establishes requirements and limitations for health plans that perform utilization review.

74.     Under Missouri Law, utilization review must be based upon documented clinical review criteria based upon sound clinical evidence.[38] Before any adverse determination is made, a licensed clinical peer must evaluate the decision's appropriateness.

75.     Under Missouri law, compensation to persons providing utilization review services for a health carrier shall not contain direct or indirect incentives for such persons to make medically inappropriate review decisions. Compensation to any such persons may not be directly or indirectly based on the quantity or type of adverse determinations rendered.[39]

76.     Because BCBSKC's vendors' findings reflect a decision that requested payment for the reported DRG level of care will be denied or reduced, BCBSKC's findings represent a utilization review decision. As such, they must be based on sound clinical evidence and be made by a licensed clinical peer.

77.     Upon information and belief, BCBSKC's compensation or incentives to its vendors and/or its vendors' compensation or incentives to their employed or contracted reviewers, contain direct or indirect incentives for such persons to make medically inappropriate review decisions that contribute to adverse clinical validation review findings.

### 3.     *BCBSKC's Opinions Invalidating Medical Diagnoses Are Not Based on Appropriate Diagnostic Criteria*

78.     In the parties' Agreement, BCBSKC agrees to comply with applicable law.[40] Under Missouri law, utilization review programs shall use documented clinical review criteria that are based on sound clinical evidence.[41] In Kansas, clinical review criteria must be written; based on professional practice; literature-based; consistently applied; and reviewed, at a minimum, annually

---

[38] RSMo § 376.1361.1.
[39] RSMo § 376.1361.
[40] Agreement at 10.9.
[41] RSMo § 376.1361.

by actively practicing physicians and other providers with current relevant knowledge.[42] Under federal regulations for the Medicare Advantage program, MA Plans are only authorized to adopt criteria which purport to establish specific definitions of diagnoses if the criteria at 42 C.F.R. § 422.101(b)(6) are followed.[43] MA organizations may only adopt such criteria if the criteria are publicly accessible, based on current evidence in widely used treatment guidelines or clinical literature.[44]

79.    BCBSKC has not informed Advent of any policy, procedure, rule or regulation establishing diagnostic criteria for any medical condition which, if not met, would purport to authorize BCBSKC to disregard physicians' diagnoses. BCBSKC has not informed Advent of any policy, procedure, rule or regulation that BCBSKC will use the results of clinical validation audits to modify federally mandated ICD-10-CM Official Guidelines for Coding and Reporting and alter Advent's Payment Rates. BCBSKC has not adopted or communicated criteria establishing specific definitions for medical diagnoses that comply with state and federal law.

80.    If BCBSKC reviewed the criteria its vendors Cotiviti and Apixio routinely apply to Advent's claims, BCBSKC failed to ensure its vendors' criteria were valid or properly applied.

81.    The medical diagnoses most frequently targeted by BCBSKC and its vendors for retrospective invalidation include, but are not limited to, sepsis, acute respiratory failure, acute congestive heart failure, acute kidney failure, severe protein calorie malnutrition, metabolic acidosis, encephalopathy, hyponatremia, pneumonia, and acute blood loss anemia. Yet, BCBSKC

---

[42] K.A.R. § 40-4-41, adopting the Kansas insurance department's "policy and procedure relating to health utilization management standards," dated March 22, 2016, pp. 10, 12, 71.
[43] 88 Fed. Reg. 22120, 22202 (April 12, 2023).
[44] 42 C.F.R. § 422.101(b)(6). Notably, current, widely used treatment guidelines are those developed by organizations representing clinical medical specialties and refer to guidelines for the treatment of specific diseases or conditions. Acceptable clinical literature includes large, randomized control trials or prospective cohort studies with clear results, published in a peer-reviewed journal, and specifically designed to answer the relevant clinical question, or large systematic reviews or meta-analyses summarizing the literature of the specific clinical question.[44]

- 25 -

has never identified or disclosed a single consensus definition of clinical criteria that define these diagnoses.

82. BCBSKC either created and instructed its vendors to apply criteria that BCBSKC never disclosed to Advent, or BCBSKC adopted its vendors' definitions of medical diagnoses. Under either circumstance, BCBSKC neglected to ensure its vendors even applied those non-binding, undisclosed definitions accurately or consistently.

83. Advent repeatedly raised concerns with Cotiviti's and Apixio's unsupported approaches in Advent's appeals, but Cotiviti's and Apixio's decisions to invalidate medical diagnoses based upon unsupported criteria went unchecked by BCBSKC, and nearly all of Advent's appeals were rejected.

84. The references BCBSKC's vendors cite as authority for their own opinions on the diagnoses of the Advent's patients are generally unsuitable as the basis for the vendors' clinical decisions, even assuming these vendors could lawfully make such decisions. BCBSKC's clinical validation audits utilize false, misleading and unsupportable justification for rejecting Advent's medical diagnoses, and for denying Advent payment for its services.

## COUNT I
## BREACH OF CONTRACT

85. Advent incorporates by reference paragraphs 1-84 above as if fully restated herein.

86. The Agreement, as amended, is a valid and enforceable contract.

87. Under the Agreement, BCBSKC is required to pay Advent the Payment Rate for Covered Services.

88. The Agreement precludes BCBSKC from attempting to recoup payments based on Medical Necessity.

- 26 -

89.     Over the past several years, BCBSKC, through its vendors, conducted several "Clinical Chart Validation Reviews." These Clinical Chart Validation Reviews typically resulted in a determination that an overpayment was made to Advent because BCBSKC paid Advent at a rate inconsistent with the DRG Advent billed. BCBSKC's modified payment is based on its vendors' recommendation to ignore documented medical diagnoses—the removal of which is unlawful, unethical and inconsistent with the Agreement. These vendors, with unknown credentials and who were not present for the evaluation, diagnosing, planning, and treatment of the patient—assigned and/or removed medical diagnoses from consideration for payment.

90.     The parties are mandated by federal statutes and regulations to adopt and to follow HIPAA standard code sets for electronic claims transactions. ICD-10-CM is the HIPAA-designated code set for the diagnosis of hospital services.

91.     At all times pertinent to this matter, the ICD-10-CM Official Guidelines for Coding and Reporting FY 2021 stated:

> code assignment is based on the documentation by the patient's provider (i.e., physician or other qualified healthcare practitioner legally accountable for establishing the patient's diagnosis). There are a few exceptions[.]However, the associated diagnosis (such as overweight, obesity, acute stroke, or pressure ulcer must be documented by the patient's provider). If there is conflicting medical record documentation, either from the same clinician or different clinicals, the patient's attending provider should be queried for clarification.

92.     BCBSKC's engagement of audit vendors who applied policies, procedures, rules or regulations against which BCBSKC intended to hold Advent responsible, without providing any such policies, procedures, rules or regulations surrounding specific definitions of medical diagnoses to Advent in advance, is a breach of the parties' Agreement.

93.     BCBSKC's improper adoption of its contractor's unlawful opinions to invalidate a medical diagnosis is in breach of the Agreement, including, but not limited to, recovering/offsetting amounts it alleges have been overpaid which involve Medical Necessity

- 27 -

(Agreement § 6.3), violating applicable law, including state law practice of medicine requirements, and exceeding the statutory lookback period of 12 months from the date of payment (Agreement § 10.9).

94.     To date, BCBSKC has offset or recouped more than 300 claims based on inappropriate "Clinical Validation" audits.

95.     On information and belief, BCBSKC has breached the Agreement's confidentiality provisions by disclosing Advent's Confidential Information to various clinical validation vendors.

96.     As a result of BCBSKC's breaches of the Agreement, Advent to date has suffered damages in excess of $2 million exclusive of prejudgment interest, in a final amount to be proven at trial. In addition, Advent also suffers ongoing irreparable harm caused by BCBSKC's interference with physicians' diagnoses, its unlawful practice of medicine or aiding and abetting in the unlawful practice of medicine, and its deceptive practices

## COUNT II
## BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

97.     Advent incorporates by reference paragraphs 1-96 above as if fully restated herein.

98.     "'[A]ll contracts have an implied covenant of good faith and fair dealing' [and t]o establish a breach of the covenant of good faith and fair dealing, the plaintiff has the burden to establish that the defendant 'exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [the plaintiff] the expected benefit of the contract.'" *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 9-10 (Mo. Ct. App. 2013) (first quoting *Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877 (Mo. Ct. App. 2012); then quoting *Mo. Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 46 (Mo. Ct. App. 2002)). The party claiming breach must have substantial evidence that it has been violated. *Id.* The Missouri Court of Appeals has found

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness and reasonableness. . . .
>
> . . .
>
> . . . Subterfuges and evasions violate the obligation of good faith in performance event though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, **abuse of power to specify terms**, and interference with or failure to cooperate in the other party's performance.

*Mo. Consol. Health Care Plan*, 81 S.W.3d at 47 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmts a and d (Am. Law Inst. 1981)) (emphasis added). *See BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 914-15 (8th Cir. 2007) (summarizing good faith and fair dealing and explaining that financial self-interest will not excuse a party from performing its contractual obligations in good faith and fair dealing).

99.     BCBSKC's clinical validation reviews are unauthorized and improper and are in breach of the implied duty of good faith and fair dealing under Missouri law and in addition breach BCBSKC's duty of confidentiality under the Agreement.

100.    As a direct and proximate result of BCBSKC's actions, Advent has suffered damages in excess of $2 million exclusive of prejudgment interest, in a final amount to be proven at trial. In addition, Advent also suffers ongoing irreparable harm caused by BCBSKC's breach of the duty of good faith and fair dealing.

**COUNT III**
**QUASI CONTRACT**

101.    Advent incorporates by reference paragraphs 1-100 above as if fully restated herein.

102. Advent enriched BCBSKC by providing legitimate and beneficial services to BCBSKC through the provision of medically necessary services to BCBSKC's members.

103. BCBSKC's enrichment includes, but is not limited to, an enhanced reputation in the community, an enhanced relationship with its Members, an enhanced ability to meet and discharge its contractual obligations to its Members.

104. BCBSKC requested – either expressly or impliedly – that Advent provide such services to BCBSKC and its members.

105. BCBSKC acquiesced to receiving Advent's services on behalf of itself and its members.

106. The services Advent provided BCBSKC had a reasonable value, in an amount to be proven at trial. Advent incurred this amount as an expense.

107. BCBSKC has failed and refused to pay for any portion of the services Advent provided to BCBSKC and its members.

108. BCBSKC has asserted it had no contractual obligation to pay and – despite Advent's demands – used BCBSKC's clinical validation audits to breach the Agreement's confidentiality and other provisions. Further, BCBSKC's conduct allowed unapproved contractors to issue unlawful medical diagnoses relating to BCBSKC's members.

109. As a direct and proximate result, BCBSKC has been unjustly enriched, and in fairness and justice, BCBSKC is obligated to pay the balance of its unjust enrichment and associated costs, in amounts to be proven at trial.

110. BCBSKC is obligated to pay the reasonable and customary value of the services Advent provided to BCBSKC and its members.

- 30 -

## COUNT IV
## PERMANENT INJUNCTIVE RELIEF

111.   Advent incorporates by reference paragraphs 1-110 above as if fully restated herein.

112.   For the above reasons, Advent has no adequate remedy at law for the ongoing violation of its rights under the Agreement and applicable law

113.   The injuries Advent will continue to suffer from BCBSKC's continuing illegal conduct outweigh any potential harm to BCBSKC from being enjoined to abide by the terms and conditions of the Agreement and to cease its illegal conduct. The balance of the equities favors Advent.

114.   The public interest will be served by an injunction prohibiting BCBSKC from engaging in the illegal and deceptive patterns and practices described herein.

115.   Consequently, Advent prays for a permanent injunction ordering BCBSKC to:

    a.   Comply with the Agreement;

    b.   Pay Advent for Covered Services in accordance with the Payment Rate for DRGs billed by Advent and supported by diagnoses documented in the medical record;

    c.   Cease actions to recoup, offset or otherwise take payments from Advent based on Medical Necessity, or altering or rejecting the medical diagnoses of Advent's physicians; and

    d.   Cease conducting Clinical Validation audits, cease providing Advent's Confidential Information to BCBSKC vendors.

## PRAYER FOR RELIEF

WHEREFORE, Advent prays the Court enter judgment as follows:

- 31 -

a)   An award of damages to Advent based on BCBSKC's breach of contract or unjust enrichment, and for breach of duty of good faith and fair dealing;

b)   An injunction preventing BCBSKC from continuing its Clinical Validation audits and/or denying reimbursement for claims based on clinical validation principles or Medical Necessity determinations or by rejecting valid medical diagnoses from Advent's physicians, and preventing BCBSKC from continuing to disclose Advent's Confidential Information to third parties without permission or consent;

c)   Prejudgment interest, pursuant to Missouri law, as well as post-judgment interest;

d)   Costs and expenses and reasonable attorneys' fees, costs and expenses; and

e)   Any other relief that the Court deems just and proper.

KUTAK ROCK LLP

*s/ M. Courtney Koger*
M. Courtney Koger      MO #42343
2405 Grand Blvd., Suite 600
Kansas City, MO  64108
Tel: 816-960-0900
Fax: 816-960-0041
Courtney.Koger@KutakRock.com

Thomas J. Kenny (*pro hac vice forthcoming*)
Suzanne M. Shehan (*pro hac vice forthcoming*)
The Omaha Building
1650 Farnam Street
Omaha, NE  68102
Tel:  402-346-6000
Thomas.Kenny@KutaRrock.com
Suzanne.Shehan-ames@KutakRock.com

Attorneys for Plaintiff Shawnee Mission Medical Center, Inc., d/b/a AdventHealth Shawnee Mission

4898-0622-2402.10

Electronically Filed - Jackson - Kansas City - July 01, 2025 - 03:28 PM

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT KANSAS CITY, MISSOURI

SHAWNEE MISSION MEDICAL CENTER,
INC. (d/b/a ADVENTHEALTH SHAWNEE
MISSION),

               Plaintiff,

v.

               Case No.

BLUE CROSS AND BLUE SHIELD OF
KANSAS CITY,

               Division No.

               Defendant.

## PLAINTIFF'S MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER

Plaintiff Shawnee Mission Medical Center, Inc., d/b/a AdventHealth Shawnee Mission ("Advent") moves for the appointment of HPS Process Service & Investigations as private process servers in the above-captioned matter:

| | | |
|---|---|---|
| Tracy Arnold | Pamela Huffman | Nathaniel Scott |
| Dianna Blea | Martin Hueckel | Grant Selvey |
| Richard Blea | Michael McMahon | Katie Shiflett |
| Alexander Blea | Jeffrey Nichols | Brian Smith |
| Grace Hazell | Diana Nichols | Shelby Stauble |
| Michael Hibler | Aubrianna Nichols | Robert E. Vick, II |
| Trinity Hibler | Christopher Reed | Brad Votaw |
| Jenna Holt | Cheryl Richey | Stephen Waters |
| Michael Huffman | David Roberts | Nick Zotti |

KUTAK ROCK LLP

*s/ M. Courtney Koger*
M. Courtney Koger        MO #42343
2405 Grand Blvd., Suite 600
Kansas City, MO  64108
Tel: 816-960-0900
Fax: 816-960-0041
Courtney.Koger@KutakRock.com

Thomas J. Kenny (*pro hac vice forthcoming*)
Suzanne M. Shehan (*pro hac vice forthcoming*)
The Omaha Building
1650 Farnam Street
Omaha, NE  68102
Tel:  402-346-6000
Thomas.Kenny@KutaRrock.com
Suzanne.Shehan-ames@KutakRock.com

- 2 -

**IN THE CIRCUIT COURT OF JACKSON COUNTY**
**AT KANSAS CITY, MISSOURI**

SHAWNEE MISSION MEDICAL
CENTER, INC.                                    )
      Plaintiff/Petitioner,      )
VS.                                                  )       Case No.:2516-CV20838
                                                     )
BLUE CROSS AND BLUE              )
SHIELD OF KANSAS CITY           )       Division No.:8
      Defendant/Respondent.    )

**AMENDED MOTION FOR APPOINTMENT OF PRIVATE PROCESS SERVER**

COMES NOW Plaintiff, by and through counsel, and pursuant to Local Rule 4.9 of Jackson County Court Rules, hereby moves for the appointment of HPS Process Service & Investigations, Inc.:

| | | |
|---|---|---|
| William | Acree | PPS25-0134 |
| Paul | Aizel | PPS25-0135 |
| Mark | Allen | PPS25-0136 |
| Sandra | Allen | PPS25-0137 |
| Tracy | Arnold | PPS25-0138 |
| Jeffrey | Aronson | PPS25-0321 |
| Brian | Bankowski | PPS25-0139 |
| Tarah | Beaulieu | PPS25-0140 |
| Richard | Benito | PPS25-0141 |
| Brenda | Benoit | PPS25-0142 |
| Allison | Bernardo | PPS25-0143 |
| Daniela | Bert | PPS25-0144 |
| Mathew | Bert | PPS25-0145 |
| David | Biddle | PPS25-0146 |
| Nicholas | Bill | PPS25-0147 |
| Bryan | Blair | PPS25-0148 |

| | | |
|---|---|---|
| Keith | Blanchard | PPS25-0149 |
| Eddie | Bland | PPS25-0150 |
| Diana | Blea | PPS25-0151 |
| Richard | Blea | PPS25-0152 |
| Thomas | Bogue | PPS25-0153 |
| Raymond | Brandy | PPS25-0154 |
| Kathy | Broom | PPS25-0155 |
| James | Burke | PPS25-0379 |
| Gary | Burt | PPS25-0156 |
| Adam | Burton | PPS25-0157 |
| Steve | Butcher | PPS25-0380 |
| Veronica | Calderon | PPS25-0158 |
| Karen | Calkins | PPS25-0159 |
| Bobby | Calvert | PPS25-0160 |
| Anna | Canole | PPS25-0161 |
| Justin | Carlson | PPS25-0162 |
| Charles | Casey | PPS25-0163 |

| | | |
|---|---|---|
| Gina | Cash | PPS25-0164 |
| George | Castillo | PPS25-0165 |
| Lori | Cole | PPS25-0166 |
| Krehl | Coleman | PPS25-0167 |
| Susan | Collins | PPS25-0168 |
| Chad | Compton | PPS25-0169 |
| James | Cox | PPS25-0018 |
| Kimberley | Cox | PPS25-0171 |
| Dennis | Dahlberg | PPS25-0021 |
| Maria | Darling | PPS25-0172 |
| Bryce | Dearborn | PPS25-0173 |
| Robert | DeLacy III | PPS25-0174 |
| Robert | DeLacy Jr | PPS25-0175 |
| Dominic | DellaPorte | PPS25-0176 |
| Cheryl | Dofelmire | PPS25-0177 |
| Claudia | Dohn | PPS25-0178 |
| Amy | Donarski | PPS25-0179 |
| Aaron | Donarski Sr. | PPS25-0180 |
| Dale | Dorning | PPS25-0181 |
| Catherine | Drake | PPS25-0182 |
| John | Dressler | PPS25-0183 |
| Rebecca | Dressler | PPS25-0184 |
| Terrence | Drew | PPS25-0185 |
| Michael | Dunard | PPS25-0186 |
| Josh | Dunn | PPS25-0187 |

| | | |
|---|---|---|
| Randy | Earl | PPS25-0188 |
| Courtney | Edwards | PPS25-0189 |
| Christopher | Eixenberger | PPS25-0190 |
| Sheri | Eixenberger | PPS25-0191 |
| Abel | Emiru | PPS25-0192 |
| Donald | Eskra Jr. | PPS25-0193 |
| Cindy | Ethridge | PPS25-0031 |
| Larry | Evans | PPS25-0194 |
| Robert | Fairbanks | PPS25-0195 |
| Ryan | Fortune | PPS25-0196 |
| Melissa | Fritz | PPS25-0197 |
| Richard | Gerber | PPS25-0198 |
| Kurie | Ghersini | PPS25-0385 |
| Adam | Golden | PPS25-0199 |
| Bradley | Gordon | PPS25-0200 |
| Kimberly | Greenway | PPS25-0201 |
| Dawn | Griffin-Luce | PPS25-0202 |
| Paul | Grimes | PPS25-0203 |
| Charles | Gunndug | PPS25-0204 |
| Mark | Hagood | PPS25-0205 |
| John | Harder | PPS25-0387 |
| Christy | Hartline | PPS25-0389 |
| James | Harvey Jr. | PPS25-0206 |
| Grace | Hazell | PPS25-0207 |
| Stephen | Heitz | PPS25-0208 |

Electronically Filed - JACKSON - KANSAS CITY - July 02, 2025 - 11:51 AM

| | | |
|---|---|---|
| Austen | Hendrickson | PPS25-0209 |
| Elizabeth | Henson | PPS25-0210 |
| Michael | Hibler | PPS25-0211 |
| Trinity | Hibler | PPS25-0212 |
| Averi | Holman | PPS25-0213 |
| Jenna | Holt | PPS25-0214 |
| Parry | Howell | PPS25-0215 |
| Martin | Hueckel | PPS25-0216 |
| Michael D | Huffman | PPS25-0217 |
| Pamela S | Huffman | PPS25-0218 |
| Anthony | Iavarone | PPS25-0219 |
| George | Illidge | PPS25-0220 |
| Frank | James | PPS25-0221 |
| Matthew | Jankowski | PPS25-0222 |
| Zachary | Jenkins | PPS25-0223 |
| Betty | Johnson | PPS25-0224 |
| Kevin | Johnson | PPS25-0225 |
| Ron | Johnson | PPS25-0226 |
| Patrick | Jones | PPS25-0227 |
| Kenneth | Kearney | PPS25-0228 |
| Ken | Klewicki | PPS25-0229 |
| Janice | Kirkhart | PPS25-0056 |
| Tyler | Kirkhart | PPS25-0057 |
| Brent | Kirkhart | PPS25-0058 |
| Anthony | Ko | PPS25-0230 |

| | | |
|---|---|---|
| Michele | Kriner | PPS25-0231 |
| Wyman | Kroft | PPS25-0412 |
| Casey | Lanford | PPS25-0232 |
| Marcus | Lawing | PPS25-0233 |
| Jennifer | Lecuyer | PPS25-0318 |
| John | Lichtenegger | PPS25-0234 |
| Bryan | Liebhart | PPS25-0235 |
| Bert | Lott | PPS25-0236 |
| Robert | Maliuuk | PPS25-0237 |
| Winnonna | Maliuuk | PPS25-0238 |
| Bonnie | Marvin | PPS25-0239 |
| Michael | McMahon | PPS25-0240 |
| Michael | Meador | PPS25-0241 |
| James | Meadows | PPS25-0242 |
| Krista | Meadows | PPS25-0243 |
| Jerry | Melber | PPS25-0244 |
| Carrie | Melte | PPS25-0245 |
| Eric | Mendenhall | PPS25-0246 |
| Matthew | Millhollin | PPS25-0247 |
| Carla | Monegain | PPS25-0248 |
| Spencer | Montgomery | PPS25-0249 |
| Christopher | Moore | PPS25-0250 |
| Daniel | Moore | PPS25-0251 |
| Michael | Morrison | PPS25-0252 |
| Nancy | Muchnick | PPS25-0253 |

| | | |
|---|---|---|
| Kelly | Murski | PPS25-0254 |
| Paul | Nardizzi | PPS25-0255 |
| Lance | Neff | PPS25-0256 |
| Wendy | Neff | PPS25-0257 |
| Jeremy | Nicholas | PPS25-0079 |
| Aubrianna | Nichols | PPS25-0258 |
| Diana | Nichols | PPS25-0259 |
| Jeffrey | Nichols | PPS25-0260 |
| Carla | Niekamp | PPS25-0359 |
| Michael | Noble | PPS25-0080 |
| Daryl | Oestreich | PPS25-0262 |
| Branson | Oxford | PPS25-0394 |
| Daniel | Owens | PPS25-0263 |
| Craig | Palmer | PPS25-0264 |
| Cynthia | Paris | PPS25-0265 |
| M. Frederick | Parsons | PPS25-0266 |
| Cody | Patton | PPS25-0267 |
| Vincent | Piazza | PPS25-0268 |
| Timothy | Pinney | PPS25-0269 |
| Nancy | Porter | PPS25-0270 |
| Mason | Potter | PPS25-0271 |
| Benjamin | Purser | PPS25-0272 |
| Jason | Ramey | PPS25-0319 |
| Jadyn | Ramey | PPS25-0320 |
| Richard | Ramirez | PPS25-0273 |

| | | |
|---|---|---|
| Christopher | Reed | PPS25-0274 |
| Gavin | Rees | PPS25-0275 |
| Lisa | Rees | PPS25-0276 |
| Cheryl | Richey | PPS25-0277 |
| Chase | Ridgeway | PPS25-0278 |
| Richard | Rober | PPS25-0279 |
| David | Roberts | PPS25-0280 |
| Patricia | Roberts | PPS25-0281 |
| Richard | Ross Jr. | PPS25-0282 |
| Steve | Rozhon | PPS25-0283 |
| Rene Ann | Rulo | PPS25-0284 |
| Robert | Sanders | PPS25-0285 |
| Vincent | Sarelli | PPS25-0286 |
| Tristan | Seaver | PPS25-0287 |
| Westley | Seifert | PPS25-0288 |
| Terri Lynn | Shean-Gilam | PPS25-0289 |
| Katie | Shiflett | PPS25-0290 |
| Kenneth | Short | PPS25-0291 |
| Jordan | Sitarski | PPS25-0292 |
| Thomas | Skinner | PPS25-0293 |
| Bryan | Smith | PPS25-0294 |
| Brian | Smith | PPS25-0295 |
| Garrett | Smith | PPS25-0296 |
| Gean | Smith | PPS25-0297 |
| Katie Jo | Smith | PPS25-0298 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Anthony | Spada | PPS25-0299 | | Zachary | Wakid | PPS25-0309 |
| Melissa | Spencer-Bryant | PPS25-0300 | | Ambiko | Wallace | PPS25-0310 |
| Samuel | Staton | PPS25-0301 | | Stephen | Waters | PPS25-0119 |
| Shelby | Stauble | PPS25-0302 | | Michael | Weaver | PPS25-0311 |
| Frances | Stewart | PPS25-0399 | | Ryan E. | Weekley | PPS25-0120 |
| Jason | Stoor | PPS25-0303 | | Austin | Weekley | PPS25-0121 |
| Steven | Stosur | PPS25-0304 | | Ryan M. | Weekley | PPS25-0122 |
| Joshua | Swanson | PPS25-0401 | | Barbara | West | PPS25-0312 |
| Cody | Swartz | PPS25-0402 | | Crystal | Williams | PPS25-0313 |
| Ravon | Swindell | PPS25-0403 | | Jack L. | Williams | PPS25-0314 |
| Ramona | Talvacchio | PPS25-0305 | | Gregory | Willing | PPS25-0315 |
| Jeffrey | Teitel | PPS25-0306 | | Conni | Wilson | PPS25-0128 |
| John | Thompson | PPS25-0307 | | Edwin | Young | PPS25-0316 |
| John | Udy | PPS25-0308 | | Nick | Zotti | PPS25-0317 |
| Robert | Vick II | PPS25-0116 | | | | |
| Brad | Votaw | PPS25-0117 | | | | |

as private process servers in the above-captioned matter.  In support of said motion, Plaintiff states that the above-named individuals are on the Court's list of approved process servers and the information contained in their applications and affidavits on file is current and still correct.

Respectfully Submitted,

KUTAK ROCK LLP

*s/ M. Courtney Koger*

M. Courtney Koger   MO #42343
2405 Grand Blvd., Suite 600
Kansas City, MO  64108
Tel: 816-960-0900
Fax: 816-960-0041
Courtney.Koger@KutakRock.com

Thomas J. Kenny (*pro hac vice forthcoming*)
Suzanne M. Shehan (*pro hac vice forthcoming*)
The Omaha Building
1650 Farnam Street
Omaha, NE  68102
Tel:  402-346-6000
Thomas.Kenny@KutaRrock.com
Suzanne.Shehan-ames@KutakRock.com

Attorneys for Plaintiff

## ORDER FOR APPOINTMENT OF PRIVATE PROCESS SERVER

It is hereby ordered that Plaintiff's Motion for Appointment of Private Process Server is sustained and that HPS Process Service & Investigations and the above named individuals are hereby appointed to serve process in the above captioned matter.

DATE: _____        _____
                                                            Judge or Circuit Clerk